JS 44C/SDNY
REV. 7/2012

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

JUN 1 2 2013

**PLAINTIFFS**
Robert Lowinger

**DEFENDANTS**
Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, Goldman, Sachs & Co.; and Facebook, Inc.

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Abraham, Fruchter & Twersky, LLP   (212) 279-5050
One Penn Plaza, Suite 2805
New York, NY 10119

**ATTORNEYS (IF KNOWN)**

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15 U.S.C. 78p(b): Action to recover short-swing insider trading profits.

Has this or a similar case been previously filed in SDNY at any time? No [ ]  Yes [✓]  Judge Previously Assigned

If yes, was this case Vol. [ ] Invol. [ ]  Dismissed. No [ ] Yes [ ]  If yes, give date _____ & Case No. _____

Is THIS AN INTERNATIONAL ARBITRATION CASE?  No [✓]  Yes [ ]

(PLACE AN [x] IN ONE BOX ONLY)    **NATURE OF SUIT**

TORTS — ACTIONS UNDER STATUTES

[✓] 850 SECURITIES/COMMODITIES/EXCHANGE

**CONTRACT**
[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**REAL PROPERTY**
[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**PERSONAL INJURY**
[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES - OTHER
[ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner)

**PERSONAL INJURY**
[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 510 MOTIONS TO VACATE SENTENCE 20 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER

**PRISONER CIVIL RIGHTS**
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

**FORFEITURE/PENALTY**
[ ] 610 AGRICULTURE
[ ] 620 OTHER FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**IMMIGRATION**
[ ] 462 NATURALIZATION APPLICATION
[ ] 463 HABEAS CORPUS-ALIEN DETAINEE
[ ] 465 OTHER IMMIGRATION ACTIONS

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[✓] 850 SECURITIES/COMMODITIES/EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

_Check if demanded in complaint:_

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

DEMAND $ _____  OTHER _____  JUDGE  Judge Robert W. Sweet   DOCKET NUMBER 12-2389-RWS

_Check YES only if demanded in complaint_
JURY DEMAND: [✓] YES [ ] NO

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

| (PLACE AN x IN ONE BOX ONLY) | | | ORIGIN | | | |
|---|---|---|---|---|---|---|
| ☑ 1 Original Proceeding | ☐ 2 Removed from State Court <br> ☐ a. all parties represented <br> ☐ b. At least one party is pro se. | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from (Specify District) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judge Judgment |

| (PLACE AN x IN ONE BOX ONLY) | | BASIS OF JURISDICTION | | IF DIVERSITY, INDICATE CITIZENSHIP BELOW. |
|---|---|---|---|---|
| ☐ 1 U.S. PLAINTIFF | ☐ 2 U.S. DEFENDANT | ☑ 3 FEDERAL QUESTION (U.S. NOT A PARTY) | ☐ 4 DIVERSITY | 8 6 & |

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Robert Lowinger
72-14 136th Street
Queens, NY 11367
Queens County

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Morgan Stanley & Co. LLC
1585 Broadway
New York, NY 10036
New York County

J.P. Morgan Securities LLC
270 Park Avenue
New York, NY 10017
New York County

Goldman, Sachs & Co.
200 West Street
New York, NY 10282
New York County

Facebook, Inc.
1601 Willow Road
Menlo Park, CA 94025
San Mateo County

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one: THIS ACTION SHOULD BE ASSIGNED TO: ☐ WHITE PLAINS  ☑ MANHATTAN
(DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE 6/12/13   SIGNATURE OF ATTORNEY OF RECORD   ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
☑ YES (DATE ADMITTED Mo. 12  Yr. 1988 )
RECEIPT #   Attorney Bar Code # JA-2946

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

Jeffrey S. Abraham
Jack G. Fruchter
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
jabraham@aftlaw.com

*Attorneys for Plaintiff Robert Lowinger*



13 CIV 4016

RECEIVED JUN 12 2013 U.S.D.C. S.D.N.Y. CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT LOWINGER,<br><br>          Plaintiff,<br><br>v.<br><br>MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, GOLDMAN, SACHS & CO., and FACEBOOK, INC.,<br><br>          Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Lowinger, by his undersigned counsel, makes the following allegations on information and belief except as to those matters that pertain to Plaintiff, which are based on Plaintiff's personal knowledge. Plaintiff's information and belief is based, *inter alia*, on a review of relevant filings made with the Securities and Exchange Commission (the "SEC") with respect to Facebook, Inc. ("Facebook" or the "Company"), the Consent Order entered into between Defendant Morgan Stanley and the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts on December 17, 2012 in *In the Matter of Morgan Stanley*

1

*& Co, LLC*, Docket No. 2012-0042 (the "Massachusetts Enforcement Action"), and other publicly available documents including news articles and securities analyst reports.

## INTRODUCTION

1. This is a direct action brought by Plaintiff, in his capacity as a shareholder of Facebook, to require Defendants to disgorge short-swing profits earned by Defendants pursuant to Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants were the lead underwriters in Facebook's initial public offering ("IPO" or the "Offering") and, in connection with the Offering, entered into agreements relating to the acquisition, holding or sale of Facebook common stock with persons beneficially owning more than 10% of both the Class A and Class B common stock. Having entered into those agreements, Defendants became beneficial owners of those shares of stock beneficially owned by other parties to the agreements. Therefore, Defendants were at all relevant times subject to the trading restrictions and profit disgorgement provisions of Section 16(b).

2. Defendants, during a time they were beneficial owners of 10% or more of Facebook's Class A and Class B common stock, earned tens of millions of dollars in short-swing profits by selling and then, within six months, purchasing shares of the Company's Class A common stock (the "Common Stock"). Shares were sold short at or above the $38.00 per share Offering price and then shares were repurchased days after at prices well below the Offering price.

3. The IPO which enabled these short-swing transactions was not conducted in good faith as Defendants: (a) deliberately withheld material adverse information with respect to Facebook's operations from all public investors and selectively disclosed those facts to a limited universe of favored investors with the result being that the IPO price was inflated and an

2

outsized proportion of the shares sold in the Offering were sold to individual investors; and (b) lent out shares sold in the Offering to short-sellers. This conduct facilitated the short-swing profits earned by Defendants.

4.  In addition, defendant Goldman Sachs & Co, Inc. in the months following the IPO, and during a time it continued to a be a beneficial owner of more than 10% of a class of Facebook equity securities, continued to purchase and sell Facebook common stock and earn short-swing profits from those trades.

## PARTIES

5.  Plaintiff Robert Lowinger (also referred to herein as "Dr. Lowinger") is a shareholder of Facebook. Dr. Lowinger made a demand on Facebook's board of directors to institute an action against Defendants for violating Section 16(b).

6.  Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability company which maintains its principal executive offices at 1585 Broadway, New York, NY 10036 and was a lead underwriter in the initial public offering ("IPO") of Facebook.

7.  Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a Delaware limited liability company which maintains its principal executive offices at 270 Park Avenue, New York, NY 10017 and was a lead underwriter in Facebook's IPO.

8.  Defendant Goldman, Sachs & Co. ("Goldman Sachs" and collectively with Morgan Stanley and J.P. Morgan, the "Underwriter Defendants" or the "Underwriters") is a New York corporation which maintains its principal executive offices at 200 West Street, New York, NY 10282 and was a lead underwriter in Facebook's IPO.

9.  Facebook is a corporation formed under the laws of the state of Delaware. Facebook maintains its principal executive offices at 1601 Willow Road, Menlo Park, California

94025. The Company's Common Stock is registered with the SEC pursuant to Section 12 of the Exchange Act, 15 U.S.C. §78l (2013) and trades on the NASDAQ under the symbol FB. Plaintiff is bringing this action in order to obtain a recovery for Facebook making the Company a necessary party to the case.

## JURISDICTION AND VENUE

10.     The claim asserted herein arises under Section 16(b) of the Exchange Act, 15 U.S.C. §78p(b) (2013). This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa (2013).

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law alleged herein occurred in this District and all of the Underwriters maintain their principal executive offices in this District.

## FACTUAL BACKGROUND

12.     Defendant Facebook owns and operates a worldwide online social network, reportedly having over one billion users. The Company has experienced a meteoric rise in the popularity of its social network following the formation of the Company in the college dorm room of now Facebook CEO Mark Zuckerberg ("Zuckerberg").

13.     There was enormous investor interest in a possible Facebook IPO. On February 1, 2012, when Facebook filed its initial S-1 registration statement with the SEC, investor interest in those disclosure documents was so intense that it reportedly caused the SEC's website to crash under the pressure of investors seeking access to the Facebook filing.

14.     A total of more than two dozen banks and investment firms participated in the underwriting syndicate for Facebook's IPO with the Underwriter Defendants selected to act as co-lead underwriters. In the IPO, Facebook sold 484,418,657 shares of Common Stock to the

public pursuant to a prospectus (the "Prospectus") filed on May 18, 2012 with the SEC as part of a Form S-1 registration statement, raising over $18 billion.

**The Lock-up Agreement Causes Each of the Underwriters
to be a Beneficial Owner of 10% or More of Facebook's Common Stock**

15. Each Facebook shareholder who sold shares of the Company's Common Stock in the IPO (the "Selling Stockholders") entered into a lock-up agreement with the Underwriters and agreed not to sell or otherwise dispose of any Common Stock or securities convertible into or exchangeable into Common Stock for specified periods of time after the date of the IPO except with the prior written consent of Morgan Stanley. The lock-up agreements provided that the Selling Stockholders, other than Zuckerberg, were eligible to sell, collectively, up to 271,123,815 shares of Common Stock 91 days after the date of the Prospectus, up to 711,494,326 shares of Common Stock on the date that is 181 days after the date of the Prospectus, and the remaining shares of common stock held by the Selling Stockholders 211 days after the date of the Prospectus.

16. The common purpose of the lock-up agreements was to control the supply of Facebook shares available to the market, which, in turn, was expected to provide support for the trading price of Facebook common stock.

17. The Selling Stockholders who had entered into the lock-up agreements with the Underwriters beneficially owned more than 10% of the outstanding shares of Common Stock.

18. Through the lock-up agreement, the Underwriters and each of the Selling Stockholders agreed to act together for the purpose of acquiring, holding, voting or disposing of the Common Stock. As such, pursuant to Exchange Act Rule 13d-5(b)(2) [17 C.F.R. §240.13d-5(b)(2) (2013)], each of the Underwriters acquired beneficial ownership of more than 10% of

Facebook's Common Stock for purposes Sections 13(d) of the Exchange Act [15 U.S.C. §78m(d) (2013)] and, pursuant to SEC Rule 16a-1(a)(1) [17 C.F.R. §240.16a-1(a)(1)] for purposes of Section 16(b) as well.

**The IPO Was Not Conducted in Good Faith**

19. Although Facebook was a highly profitable enterprise, investor valuation of the Company and the price of the Common Stock were dependent upon, and related to, investor expectations for the Company's future revenue and earnings growth. The higher investor expectations were for Facebook being able to capitalize on the popularity of its social media network in order to produce ever increasing streams of revenue and profits for the Company, the higher the price that investors would be willing to pay in the IPO for the Common Stock.

20. In March and April 2012, Facebook's CFO David Ebersman ("Ebersman") shared with the Underwriters Facebook's internal revenue forecasts of $1.1 to 1.2 billion for 2Q12 and $5 billion for fiscal year 2012.

21. The Underwriters utilized this information in preparing research reports for their investor clients: Morgan Stanley forecast 2Q12 revenue of $1.175 billion and FY2012 revenue of $5.036 billion; J.P. Morgan forecast 2Q12 revenue of $1.182 billion and FY2012 revenue of $5.044 billion; and Goldman Sachs forecast 2Q12 revenue of $1.207 billion and FY2012 revenue of $5.169 billion. These revenue estimates were also incorporated into materials used by the Underwriters to market the Facebook IPO to investors in a road show commenced on May 7, 2012.

22. On May 7, 2012, Ebersman advised Michael Grimes ("Grimes"), Morgan Stanley's lead banker for the IPO, that based on existing second quarter data, Facebook was no longer confident that the Company would meet its prior internal revenue estimates because the

6

trend of increasing mobile usage among users and "certain product decisions" made by Facebook were likely to materially adversely impact Facebook's revenues. Accordingly, Facebook revised its revenue estimates downward. Second quarter revenues were estimated to be at the low end of the $1.1 to $1.2 billion range and the full year was forecast to be 3% to 3.5% lower than the previously forecasted $5 billion.

23. The following day, May 8, 2012, Facebook's Treasurer Cipora Herman ("Herman") requested by email that Facebook's finance department provide her, and Morgan Stanley bankers copied on the email, with information to determine the divergence between Facebook's updated forecast and what industry analysts had forecast. Herman stressed that she and the Morgan Stanley bankers needed the information immediately.

24. Grimes advised Ebersman that Facebook should provide its new revenue forecasts to the Underwriters so that they could revise their models. At a conference call held on May 8, 2012, among Ebersman, Facebook's counsel, Grimes, Morgan Stanley bankers, and Morgan Stanley's counsel, Ebersman expressed concern that providing such guidance to analysts but not to investors "would create an appearance that the underlying business information wasn't shared with all investors."

25. Grimes proposed that Facebook file an amendment to the Form S-1 registration statement with the updated Q2 trend information and thereafter speaking to analysts to offer them updated guidance based upon that public filing. Facebook's May 9 amended Registration Statement and Prospectus read as follows:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of [daily active users] increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by increasing usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in

7

part due to certain pages having fewer ads per page as a result of product decisions. For additional information on factors that may affect these matters, see "Risk Factors—Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results" and "Risk Factors—Our culture emphasizes rapid innovation and prioritizes user engagement over short-term financial results."

26. This disclosure, however, was vague and did not properly inform investors of the material facts which Ebersman had told to Grimes. The disclosure in the amended Registration Statement failed to disclose, as Ebersman had told Grimes, that these factors had already materially impaired Facebook's revenue.

27. Ebersman and Grimes arranged for Herman to, immediately after the filing of the May 9, 2012 amendment to the Form S-1, conduct individual 15-minute update calls with select investment bankers and their securities analysts, including the Underwriter Defendants' investment bankers and analysts.

28. They specifically elected to communicate their information orally, rather than in writing to avoid the requirements of SEC Regulation FD, which provides that when material nonpublic information is provided to an analyst about an offering, the same information must be provided to the public, except when the information is conveyed through an "oral communication." See 17 C.F.R. §243.100 (2013).

29. Herman's first call to a securities analyst was to one at Morgan Stanley, followed by calls to securities analysts working for Defendants J.P. Morgan and Goldman Sachs, and then to analysts working with other underwriters of the IPO.

30. Grimes prepared a script for Herman which made clear to the analysts that

Facebook had significantly cut its revenue estimates. The script which was subsequently (*i.e.*, after the IPO) provided by Facebook to regulators in connection with the Massachusetts Enforcement Action read as follows:

> I wanted to make sure you saw the disclosure we made in our amended filing. The upshot of this is that **we believe we are going to come in the lower end of our $1.1 to $1.2 bn range for Q2 based upon the trends we described in the disclosure.** A lot of investors have been focused on whether the trend of ad impressions per user declining (primarily as a result of mobile) was a one-time, or continuing, occurrence. As you can see from our disclosure, the trend is continuing. You can decide what you want to do with your estimates, our long term conviction is unchanged, **but in the near term we see these trends continuing, hence our being at the low end of the $1,100 + $1,200 range.** (Emphasis added).

31.     Subsequent to their respective individual calls with Herman, the Underwriter Defendants' analysts revised their Facebook 2Q12 estimates to the lower end of the $1.1 to $1.2 billion range as follows:

| Defendant | 2Q12 Revenue Estimates | Revised 2Q12 Revenue Estimates | % Difference |
|---|---|---|---|
| Morgan Stanley | $1.175 | $1.111 | -5.45% |
| J.P. Morgan | $1.182 | $1.096 | -7.28% |
| Goldman Sachs | $1.207 | $1.125 | -6.79% |
| Numbers in the billions | | | |

32.     Similarly, the Underwriter Defendants also reduced their full year revenue estimates as shown in the table below. The reduced figures dramatically changed the valuation of

9

Facebook:

| Defendant | FY 2012 Revenue Estimates | FY 2012 Revised Revenue Estimates | FY 2012 % Change | 2013 Earnings Per Share | 2013 Revised Earnings Per Share | EPS % Change |
|---|---|---|---|---|---|---|
| Morgan Stanley | $5.036 | $4.854 | -3.61% | $0.88 | $0.83 | -5.68% |
| J.P. Morgan | $5.044 | $4.839 | -4.06% | $0.70 | $0.66 | -5.71% |
| Goldman Sachs | $5.169 | $4.852 | -6.13% | $0.68 | $0.63 | -7.35% |
| Numbers in the billions | | | | | | |

33. Retail investors eagerly anticipated the Offering with tens of thousands of orders placed by small investors in advance of the IPO. On its first day of trading, Facebook accounted for an unprecedented percentage of all trades executed by TD Ameritrade, almost five to ten times the norm for the day a company goes public.

34. On May 17, the Common Stock, supported by the significant retail demand, opened at $42.05, or more than 10% above the IPO price. Through May 17 and 18, 2012, the underwriters sold 484,418,657 shares of Common Stock to the public at prices ranging from $38 to $42.05 per share, including 63 million shares in short sales pursuant to their over-allotment or "greenshoe" option. Of these shares sold, the Underwriter Defendants collectively sold at least 310,238,557 shares, with Morgan Stanley selling at least 162,174,942 shares, J.P. Morgan selling at least 84,878,573 shares and Goldman Sachs selling at least 63,185,042 shares.

35. However, at the very same time that defendants JP Morgan and Goldman Sachs were serving as lead underwriters for Facebook's IPO, as reported in the May 24, 2012 edition of *The Wall Street Journal*, they were also actively engaged in obtaining fees for lending out shares of Common Stock to short sellers. As of May 18, 2012, the first day on which the Common Stock was publicly traded, 25% of trading volume was attributable to short sales.

### After the Initial Run-Up, Facebook's Common Stock Quickly Craters Upon Disclosure of the Adverse Facts Relating to Facebook's Growth Rate

36. Reports of the decline in Facebook's expected revenues began to emerge after the stock markets closed on Friday, May 18, and continued over the next two trading days. It was further revealed that the Underwriter Defendants had cut their revenue estimates in advance of the IPO. Thus, on Saturday, May 19, *The Business Insider* reported that the lowered guidance was "highly material information," and the selective disclosure of that information represented "the exact sort of unfair asymmetry that securities laws are designed to prevent."

37. On Monday, May 21, the first trading day after it was revealed that Facebook had revised revenue forecasts significantly downward during the road show, Facebook shares continued to slide on extremely high volume. The sell-off of Facebook shares came so quickly at the open that NASDAQ restricted short sales to prevent additional pressure on the Common Stock. Facebook shares closed down at $34.03 on extremely high volume reflecting a decline of more than 10% from the Company's IPO price of $38.00 per share.

38. On May 22, *Reuters* issued a report which revealed that the Underwriter Defendants had known about Facebook's significantly revised negative revenue forecasts during the roadshow, but appeared to have told only a few "major clients" which in turn contributed to the decline in the IPO price when other investors learned of the negative forecasts. *Reuters* reported that just before Facebook's $16 billion IPO, Morgan Stanley, the lead underwriter on the deal, unexpectedly delivered some negative news to major clients: The bank's consumer Internet analyst, Scott Devitt, was reducing his revenue forecasts for the company. The people familiar with the revised Morgan Stanley projections said Devitt cut his revenue estimate for the current second quarter significantly, and also cut his full-year 2012 revenue forecast.

11

39. On May 22, the slide of the price of the Common Stock continued as it opened below the previous day's $34.03 closing price and closed at $31 per share, again on extremely high volume.

40. In December 2012 Morgan Stanley was fined $5 million in the Massachusetts Enforcement Action for giving analysts information with respect to Facebook that was not provided to all investors.

**The Underwriter Defendants Purchased Common Stock**
**Within Six Months of Their Sales of Common Stock**

41. On May 18, 2012, and continuing throughout, at least, May 2012, the Underwriter Defendants purchased Facebook Common Stock at prices lower than $38.00 per share.

**The Underwriter Defendants Profited**
**From Their Short-Swing Trading**

42. The Underwriter Defendants made a profit by selling the Common Stock in the IPO on or about May 18, 2012 at higher prices than the prices of the shares of Common Stock they purchased throughout May 2012. On May 24, 2012, *The Wall Street Journal* reported that "Morgan Stanley and other underwriters made a profit of about $100 million with the bulk of that profit being made on Monday May 21, 2012 "**when they bought shares below the $38 offering price.**" (Emphasis added.)

43. A Schedule 13F filed by Goldman Sachs with the SEC for the fiscal quarter ended June 30, 2012 reflects that Goldman Sachs owned 9,507, 859 shares of Common Stock, owned options to acquire 1,272,900 shares of Common Stock and also owned put options, or options to sell, 5,732,700 shares of Common Stock. Facebook's Common Stock price during this period ranged from a low of $25.52 per share to a high of $45.00 per share.

44. A Schedule 13F filed by Goldman Sachs with the SEC for the fiscal quarter ended September 30, 2012 reflects that Goldman Sachs owned 3,916,000 shares of Common Stock, owned options to acquire 2,386,900 shares of Common Stock and also owned put options, or options to sell, 7,586,700 shares of Common Stock.

45. Defendant Goldman Sachs's sold 5,591,649 shares of Common Stock between June and September 2012 at prices higher than the prices it paid for the over 9,000,000 shares of Common Stock it purchased in May 2012. Throughout this period of time the price of the Common Stock ranged from a low of $17.55 per share to a high of $32.88 per share. Similarly, the prices of both the call and put options for Common Stock fluctuated in price enabling Goldman Sachs to earn short-swing profits from its trading in Facebook securities which are required to be disgorged to the Company.

46. The short-swing profits realized by the Underwriter Defendants from their sales and purchases of Common Stock within a six month period were obtained in violation of Section 16(b) and the Underwriter Defendants are required to disgorge those short-swing profits back to Facebook.

## ALLEGATIONS AS TO DEMAND

47. On September 12, 2012, demand for prosecution pursuant to Section 16(b) was made on Facebook based on the facts alleged above (the "Demand"). On October 9, 2012, Facebook responded to the Demand requesting additional information and factual support for certain assertions in the Demand.

48. On November 6, 2012 Plaintiff's counsel wrote again to Facebook explaining that consistent with the Ninth Circuit decision in *Simmonds v. Credit Suisse Secs, Inc.*, 2011 U.S.

13

App. LEXIS 974 *22 (9th Cir. Jan. 18, 2011) the Demand easily complied with Section 16(b)'s demand requirement.

49.     More than sixty days have passed from the date of the Demand and the Company has failed to recover the profits alleged herein or to institute a lawsuit to recover those profits.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against Defendants in an amount to be determined at trial, plus pre-judgment interest, post-judgment interest and such other and further relief as this Court may deem just and proper.

Dated: June 12, 2013

_____
Jeffrey S. Abraham
Jack G. Fruchter
**ABRAHAM, FRUCHTER
 & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
jabraham@aftlaw.com
jfruchter@aftlaw.com

*Attorneys for Plaintiff Robert Lowinger*