**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION | MDL No. 12-2389 |
| | ECF Case |
| ROBERT LOWINGER, | |
| *Plaintiff*, | |
| v. | This document relates to: 13 Civ. 4016 |
| MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, GOLDMAN, SACHS & CO., and FACEBOOK, INC., | |
| *Defendants*. | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## LEAD UNDERWRITERS' MOTION TO DISMISS

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Defendants Morgan Stanley*
*& Co. LLC, J.P. Morgan Securities LLC and*
*Goldman, Sachs & Co.*

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..............................................................................................................................3

I.   THE LEAD UNDERWRITERS WERE NOT MEMBERS OF A SECTION 16(b) GROUP ........................................................................................3

II.  THE UNDERWRITERS' PURCHASES AND SALES IN CONNECTION WITH THE FACEBOOK IPO ARE EXEMPT FROM SECTION 16 ...................7

     A.   Plaintiff Bears the Burden of Pleading a Plausible Claim ...........................7

     B.   The IPO-Related Transactions Are Exempt Pursuant to Rule 16a-7 ..........8

     C.   The Opposition Does Not Overcome Plaintiff's Failure to Plead with Particularity that the Facebook IPO Was Not Conducted in Good Faith ...............................................................................................10

III. PLAINTIFF FAILS TO DEMONSTRATE THAT GOLDMAN SACHS EARNED SHORT-SWING PROFITS .................................................................15

CONCLUSION ...........................................................................................................................17

# TABLE OF AUTHORITIES

P<small>AGE</small>

C<small>ASES</small>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...................................................................16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...............................................8, 17

*Chechele v. Morgan Stanley*, 896 F. Supp. 2d 297 (S.D.N.Y. 2012) ..........................17

*Chechele v. Scheetz*, 819 F. Supp. 2d 342 (S.D.N.Y. 2011),
    *aff'd*, 466 F. App'x 39 (2d Cir. 2012)...............................................................5, 6

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992)........................................8

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011).................................................................15

*Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (S.D.N.Y. 2010)........................................14

*Conley v. Gibson*, 355 U.S. 41 (1957) ...............................................................8

*In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB),
    2007 WL 1946553 (S.D.N.Y. June 28, 2007) ....................................................11

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276 (2d Cir. 2011) ...............4, 6

*Dawson v. Bumble & Bumble*, 246 F. Supp. 2d 301 (S.D.N.Y. 2003) ..........................11

*Donaghue v. Accenture Ltd.*, No. 03 Civ. 8329 (NRB),
    2004 WL 1823448 (S.D.N.Y. Aug. 16, 2004).....................................................5

*Dreiling v. America Online, Inc.*, No. C05-1339JLR,
    2005 WL 3299828 (W.D. Wash. Dec. 5, 2005) ..................................................11

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 922 F. Supp. 2d 445 (S.D.N.Y. 2013) .........12

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    MDL No. 12-2389, 2013 WL 6665399 (S.D.N.Y. Dec. 12, 2013) ........................12

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    MDL No. 12-2389, 2013 WL 6798160 (S.D.N.Y. Dec. 23, 2013) ...................12, 13

*Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493 (S.D.N.Y. 2013) ...................16, 17

*Gibbons v. Malone*, 703 F.3d 595 (2d Cir. 2013) ...........................................9

*In re IPO Securities Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................15

*JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514 (S.D.N.Y. 2013)....................................17

*Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP),
    2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)...............................................................10, 11

*Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC),
    2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)........................................................................11

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) .........................7

*M'Baye v. N.J. Sports Prod., Inc.*, No. 06 Civ. 3439 (DC),
    2007 WL 431881 (S.D.N.Y. Feb. 7, 2007)...............................................................................11

*Mercer v. Gupta*, 712 F.3d 756 (2d Cir. 2013) ..............................................................................8

*Morales v. New Valley Corp.*, 999 F. Supp. 470 (S.D.N.Y. 1998)..................................................6

*Morales v. Quintel Entm't, Inc.*, 249 F.3d 115 (2d Cir. 2001) ...............................................4, 5, 7

*Perine v. William Norton & Co.*, 509 F.2d 114 (2d Cir. 1974) ....................................................10

*Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418 (1972) .....................................................9

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................................10

*Roth v. Reyes*, No. C 06-2786 (CRB), 2007 WL 518621 (N.D. Cal. Feb. 13, 2007) ..........9, 10, 11

*Segen v. CDR-Cookie Acquisitions, L.L.C.*, No. 05 Civ. 3509 (RWS),
    2006 WL 59550 (S.D.N.Y. Jan. 4, 2006) ...............................................................................8

*Segen v. Rickey*, No. C07-02917 MJJ, 2008 WL 590505 (N.D. Cal. Feb. 29, 2008)....................8

*Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171 (S.D.N.Y. 1996) ..............................12

*Stern v. Gen. Electric Co.*, 924 F.2d 472 (2d Cir. 1991) ..............................................................11

*Stevelman v. Alias Research Inc.*, 174 F.3d 79 (2d Cir. 1999) .....................................................15

*U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, No. 12 Civ. 4873 (CM),
    2012 WL 6136017 (S.D.N.Y. Dec. 11, 2012) ........................................................................7

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) .....................................................................6

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998)........................................................16

<u>STATUTES, RULES AND ADMINISTRATIVE GUIDANCE</u>

15 U.S.C. § 78m(d)(3) ............................................................................................4

15 U.S.C. § 78p(a) .................................................................................................9

17 C.F.R. § 240.13d-5(b)(1) ...............................................................................1, 4

17 C.F.R. § 240.16a-7 ............................................................................................8

Fed. R. Civ. P. 9(b) ..............................................................................................10

Amendments to Regulation M:  Anti-Manipulation Rules Concerning Securities Offerings,
    Release No. 33-8511, 69 Fed. Reg. 75774 (Dec. 17, 2004) ...................................13

Ownership Reports and Trading by Officers, Directors and Principal Shareholders,
    53 Fed. Reg. 49997 (Dec. 13, 1998).................................................................9

<u>OTHER AUTHORITIES</u>

Amy K. Edwards & Kathleen W. Hanley,
    *Short Selling in Initial Public Offerings*, 98 J. Fin. Econ. 21 (2010)................................13, 14

Brief of the Securities and Exchange Commission, *Amicus Curiae*,
    in Support of Appellant on Issues Addressed at 26-27,
    *Morales v. Quintel Entm't, Inc.*, No. 99-9374 (2d Cir. Mar. 2000)............................5

David A. Westenberg, *Initial Public Offerings:*
    *A Practical Guide to Going Public* (1st ed. 2011)................................................13

FINRA Rule 5131(d)(3)(B)(ii), *available at* http://finra.complinet.com/en/display/
    display_main.html?rbid=2403&element_id=9751 ...............................................13

Defendants Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC and Goldman, Sachs & Co. (collectively, the "Lead Underwriters") respectfully submit this reply memorandum of law in support of their motion to dismiss the complaint in this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff's opposition brief confirms that his Section 16(b) claim boils down to the untenable proposition that the Lead Underwriters formed a "group" with the Selling Shareholders solely by virtue of the Selling Shareholders' execution of customary lock-up agreements prior to the Facebook IPO.  Plaintiff concedes that lock-up agreements are not in and of themselves a plausible basis for finding a Section 16 group.  Instead, he maintains that the lock-up agreements executed for the Facebook IPO reflected a common purpose of the Selling Shareholders and Lead Underwriters to support the post-IPO price.  The opposition identifies no allegations, however, distinguishing that Facebook IPO "purpose" from every other IPO, and if sufficient to demonstrate a group here, such an approach would subject every such offering to Section 16.  The statute and the related rules reflect the judgment of Congress and the SEC that entities form a group only when they "act together" for the purpose of "acquiring, holding, voting or disposing of securities."  17 C.F.R. § 240.13d-5(b)(1).  Plaintiff's opposition ignores this controlling language, and fails to show that the Lead Underwriters "acted together" with the Selling Shareholders for any of the specified purposes that may justify group treatment.

Moreover, beyond its failure to demonstrate any basis for Section 16 group treatment, the opposition also never shows how the Lead Underwriters' alleged sale-and-purchase transactions fall outside the exemption for such activities in SEC Rule 16a-7.  Plaintiff does not dispute that the Facebook IPO was a genuine distribution of securities, or that the Lead Underwriters' sale-

and-purchase transactions were made in connection with that distribution.  Rather, he mistakenly argues that the Lead Underwriters cannot invoke the Rule 16a-7 exemption at this stage because they must prove that they conducted themselves with "honesty and decency" in a broader sense, which he says is belied by the alleged disclosure violations at issue in the consolidated class action before this Court.  The opposition cites no relevant support for that unprecedented argument, which as the Lead Underwriters demonstrated in their opening brief, would defeat the SEC's stated position that Section 16 does not govern underwriters acting as conduits in securities distributions, in part because such conduct is closely regulated by *other* federal securities laws.  It also contravenes Congress's stated intent that Section 16 be a rule of easy administration and, again, proposes to subject virtually every IPO to Section 16 exposure based on a contrived "honesty" attack.

Nor does the opposition cure the complaint's failure to support plaintiff's theory that the Lead Underwriters did not act in good faith.  To the extent plaintiff sought to draw an inference of bad faith from the Lead Underwriters sharing analysts' estimates of Facebook's future revenues with their investor clients, plaintiff does not dispute that such conduct is permitted by the SEC.  The opposition similarly fails to explain how bad faith can be inferred from the Lead Underwriters' covering of their over-allotment short sales, and from alleged share-lending to short sellers – well-settled industry practices that are customary and accepted by the SEC.  Plaintiff offers no effective response to the Lead Underwriters' argument that, at a minimum, the complaint does not plead its theory that the Lead Underwriters intended to defraud investors with the particularity required by Rule 9(b); indeed, it is not even plausible under the less exacting *Twombly* standard.

Nor does plaintiff sufficiently defend his additional conclusory claim based on Goldman Sachs' purported trading after the IPO.  Indeed, plaintiff's opposition brief abandons his claim that Goldman Sachs purchased Facebook shares in May 2012 and then sold a portion of them by September 30, 2012.  Instead, his brief improperly makes *new* allegations, which appear nowhere in the complaint, that Goldman Sachs sold Facebook shares in the IPO and then purchased Facebook stock after the IPO in May 2012.  Beyond being unpleaded, this new claim fails for two reasons.  First, Goldman Sachs was not a 10-percent shareholder at any time after the IPO, so any purchases after the IPO cannot possibly be a basis for disgorgement.  And, second, the opposition points to no allegation supporting an inference that Goldman Sachs sold its Facebook stock in the IPO at a price higher than the price at which it allegedly later purchased stock in the market.  Plaintiff only conjectures that such a combination of facts occurred, which is not sufficient to state a plausible claim.

## ARGUMENT

## I.    THE LEAD UNDERWRITERS WERE NOT MEMBERS OF A SECTION 16(b) GROUP

The opposition does not dispute that the mere existence of lock-up agreements is insufficient to establish a "group" under Section 16(b).  Instead, it argues that group activity can be inferred from the Selling Shareholders' lock-up agreements because they were "motivated by the specific desire to facilitate the sale of Facebook stock in the IPO by keeping stock off the market."  (Pl. Mem. at 8.)[1]  But, plaintiff cannot show that the Lead Underwriters "agree[d] to act together" with the Selling Shareholders in furtherance of this purported "purpose," because it

---

[1] Citations to "Pl. Mem." refer to Plaintiff's Memorandum of Law in Opposition to the Lead Underwriters' Motion to Dismiss (Dkt. No. 17).  Citations to "Defs. Mem." refer to the Memorandum of Law in Support of Lead Underwriters' Motion to Dismiss (Dkt. No. 12).

is undisputed that the Lead Underwriters never agreed to hold Facebook stock for any amount of time.  17 C.F.R. § 240.13d-5(b)(1); *see also CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 284 (2d Cir. 2011) ("[T]wo or more entities do not become a group . . . unless they '***act as a . . . group***' . . ." (quoting 15 U.S.C. § 78m(d)(3) (emphasis added))); Defs. Mem. at 16-20.  Plaintiff never explains how the Lead Underwriters could have "agreed to act together" with the Selling Shareholders to limit the supply of Facebook stock in the market without themselves ever agreeing to hold any stock.

Nor does the opposition identify any support for plaintiff's theory that the common desire of selling shareholders and underwriters for a successful IPO – inherent in all such offerings – can supply a basis for a Section 16(b) group.  That shared objective does not meet the statutory test of showing that the Lead Underwriters and the Selling Shareholders acted together "for the purpose of acquiring, holding, voting or disposing" of stock.  17 C.F.R. § 240.13d-5(b)(1).

The cases cited by plaintiff do not hold otherwise.  In *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115 (2d Cir. 2001), the Second Circuit held that much broader allegations than simply lock-up agreements by shareholders were sufficient to plead a Section 16(b) group.  *Id.* at 127.  In *Quintel*, the group members all were direct owners of a closely held corporation who had received shares in a stock-for-stock transaction governed by a common purchase agreement. *Id.* at 119-20.  Here, there is no such alignment of interests:  the Selling Shareholders were sellers and holders of Facebook stock, whereas the Lead Underwriters acted as distributors of the stock being sold in the IPO.  Moreover, the group members in *Quintel* unquestionably "acted together" for the purposes of buying, selling and holding the issuer's stock.  They acquired the issuer's stock at the same time, pursuant to the same agreement, and they each engaged in the same coordinated conduct, simultaneously depositing shares into, and later simultaneously

4

redeeming their shares from, three simultaneously created identical trusts.  *Id.* at 125, 127.

Indeed, the court held that it was "reasonable" for the issuer to "perceive" the group members as

a "single unit."  *Id.* at 127.  There is no argument here that the Lead Underwriters bought, sold or

held Facebook shares together with the Selling Shareholders.  Nothing about the Lead

Underwriters' role or activities remotely suggests that they constituted a "single unit" together

with the Selling Shareholders.  The *Quintel* court further reasoned that the group members had

all agreed to lock-up provisions that governed their holding and disposing of the stock they

received.  *Id.*[2]  By contrast, plaintiff does not and cannot contend that the Lead Underwriters

agreed to any lock-up themselves.[3]

The opposition fails to distinguish the lock-up agreements signed by the Selling

Shareholders from the agreements that were deemed insufficient to establish a Section 16 group

even among shareholders in *Chechele v. Scheetz*, 819 F. Supp. 2d 342 (S.D.N.Y. 2011), *aff'd*,

466 F. App'x 39 (2d Cir. 2012), and *Donaghue v. Accenture Ltd.*, No. 03 Civ. 8329 (NRB), 2004

WL 1823448 (S.D.N.Y. Aug. 16, 2004).  Plaintiff argues that these cases involved "parallel lock-

---

[2] The opposition wrongly asserts that an *amicus* brief submitted by the SEC in *Quintel* supports plaintiff's theory.  (Pl. Mem. at 8-9.)  In that brief, the SEC stated that a hypothetical lock-up agreement between an issuer and certain shareholders "*might*" establish "an agreement by a group of *shareholders* to act together for the purposes of acquiring, holding, or disposing of securities."  Brief of the Securities and Exchange Commission, *Amicus Curiae*, in Support of Appellant on Issues Addressed at 26-27, *Morales v. Quintel Entm't, Inc.*, No. 99-9374 (2d Cir. Mar. 2000) (emphasis added).  The SEC's hypothetical group, like the claimed group in *Quintel*, were all *shareholders* who agreed to act together to hold stock, one of the purposes specified by Section 13(d).  The SEC's statement in no way suggests that underwriters could be regarded as forming a group with shareholders for purposes of Section 16 whenever the shareholders agree to lock-ups in connection with securities distributions such as an IPO.

[3] The Goldman Sachs Group, Inc. and certain affiliated entities, but not defendant Goldman, Sachs & Co., owned Facebook stock prior to the IPO.  (Declaration of Jeffrey S. Abraham in Support of Plaintiff's Opp'n to the Lead Underwriters' Mot. to Dismiss (Dkt. No. 18) ("Abraham Decl."), Ex. A at 141, 143 nn.22-23.)

up agreements," which could not be "aggregated" and were not "a single arrangement."  (Pl. Mem. at 9-10.)  But, in *Scheetz*, the court held simply that the alleged lock-up agreements, "standing alone, are not enough to allege the existence of a shareholder group."  819 F. Supp. 2d at 349.  Nothing in *Scheetz* suggests that the court rejected plaintiff's allegations because the lock-ups were "parallel" agreements.  Nor does *Sheetz* suggest that plaintiff's allegations here would somehow satisfy the requirements of Section 16.

Plaintiff ultimately retreats to an argument that, even if the Lead Underwriters "***lacked a common purpose***" with the Selling Shareholders, a Section 16(b) group still may exist because members of a group need not "'march in lockstep.'"  (Pl. Mem. at 12 (emphasis added).)  But, as explained in the Lead Underwriters' opening brief (Defs. Mem. at 16), the Second Circuit has made plain that members of a group must have "***combined*** in furtherance of a ***common objective***" to acquire, hold, vote or dispose of securities.  *CSX Corp.*, 654 F.3d at 283 (emphasis added) (internal quotation marks omitted).  While persons need not share every objective to combine as a Section 16(b) group, they must share at least one of the purposes enumerated by the statute, and they must "agree to act together" in furtherance of that purpose.  The opposition fails to show that the Lead Underwriters shared any such statutory objective or made any such agreement with the Selling Shareholders.[4]

Further, plaintiff's argument that the Lead Underwriters and the Selling Shareholders shared a common purpose to "provide support for the trading price of Facebook common stock"

---

[4] Contrary to plaintiff's assertion (Pl. Mem. at 14), the Lead Underwriters do not contend that a Section 16(b) group requires a control purpose or a right of first refusal.  *Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982), and *Morales v. New Valley Corp.*, 999 F. Supp. 470 (S.D.N.Y. 1998), cited in the Lead Underwriters' opening brief, are merely examples of cases where, unlike here, a Section 16 group was adequately pled based on allegations that go beyond anything alleged by plaintiff.

(Compl. ¶ 16) is contradicted by the opposition's assertion that the Lead Underwriters intentionally permitted Facebook's stock price to "plummet" after the IPO, in order to earn a profit by covering over-allotment sales with purchases below the offering price.  (Pl. Mem. at 30.)  The Lead Underwriters could not have "acted together" with the Selling Shareholders with a "common purpose" *to support* the price of Facebook stock if, as the opposition asserts, the Lead Underwriters intentionally permitted the share price *to plummet*, in order to make a profit. In short, plaintiff accuses the Lead Underwriters of "plainly frustrat[ing] the purported purposes of the [alleged] agreement" to support Facebook's stock price, and this contradiction alone is sufficient to defeat plaintiff's claim.  *Cf. Quintel*, 249 F.3d at 127 (explaining that the absence of coordinated trading by certain Section 16 group members did not "defeat" plaintiff's group allegations because the members' uncoordinated actions "[did] not plainly frustrate the purported purposes of the agreement" to act together).[5]

## II.   THE UNDERWRITERS' PURCHASES AND SALES IN CONNECTION WITH THE FACEBOOK IPO ARE EXEMPT FROM SECTION 16

### A.   Plaintiff Bears the Burden of Pleading a Plausible Claim.

The opposition incorrectly argues that the Lead Underwriters bear the burden at this stage of "proving beyond doubt" that the sale-and-purchase transactions at issue fall outside the exemption in Rule 16a-7.  (Pl. Mem. at 17.)  Courts routinely dismiss Section 16(b) claims where it is apparent from the factual allegations on the face of the complaint that an exemption from

---

[5] Because "plaintiff's own pleadings are internally inconsistent," the Court is "neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss."  *U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, No. 12 Civ. 4873 (CM), 2012 WL 6136017, at *7 (S.D.N.Y. Dec. 11, 2012) (internal quotation marks omitted); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) (stating that "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely").

Section 16 applies.  *See, e.g.*, *Mercer v. Gupta*, 712 F.3d 756, 759-60 (2d Cir. 2013) (analyzing

plaintiff's allegations and dismissing Section 16(b) claim because defendant did not have

pecuniary interest in stocks at issue pursuant to Rule 16a-1 exemption); *Segen v. CDR-Cookie*

*Acquisitions, L.L.C.*, No. 05 Civ. 3509 (RWS), 2006 WL 59550, at *6-8 (S.D.N.Y. Jan. 4, 2006)

(dismissing Section 16(b) claim based on Rule 16b-3 exemption for "directors by deputization"

because the "alleged facts are sufficient" to satisfy the exemption for certain defendants); *see*

*also Segen v. Rickey*, No. C07-02917 MJJ, 2008 WL 590505, at *6 (N.D. Cal. Feb. 29, 2008)

(dismissing Section 16(b) claim based on Rule 16b-3 exemption because plaintiff had "pleaded a

theory that runs directly into the exemption").[6]

## B.      The IPO-Related Transactions Are Exempt Pursuant to Rule 16a-7.

In their opening brief, the Lead Underwriters explained (Defs. Mem. at 21-24) that the

sale-and-purchase transactions at issue are exempted by Rule 16a-7 because (1) they were "made

in connection with the distribution of a substantial block of securities" by underwriters "engaged

in the business of distributing securities" and "participating in good faith, in the ordinary course

of such business," and (2) the securities at issue were "purchased in good faith" in order to

"cover an over-allotment or other short position."  17 C.F.R. § 240.16a-7.

Plaintiff wrongly argues that Rule 16a-7 requires underwriters to demonstrate something

beyond their participation as conduits in a valid distribution of securities.  He asserts that, to

qualify for the exemption, the Lead Underwriters bear an affirmative burden of proving that they

satisfied amorphous and undefined "'standards of decency and honesty.'"  (Pl. Mem. at 19.)  The

---

[6] The case plaintiff claims as support for his contention, *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992), described the pleading standard for *plaintiffs* under the "no set of facts" standard of *Conley v. Gibson*, 355 U.S. 41 (1957), which the Supreme Court rejected in favor of a more stringent plausibility standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562-64 (2007).

opposition offers no relevant authority for this contention and, to the contrary, disregards the SEC's stated position that Section 16 does not govern underwriters acting as conduits for securities, given that those activities are regulated by other federal securities laws. *See* Ownership Reports and Trading by Officers, Directors and Principal Shareholders, 53 Fed. Reg. 49997, 50004 (Dec. 13, 1988); *see also Roth v. Reyes*, No. C 06-2786 (CRB), 2007 WL 518621, at *7 (N.D. Cal. Feb. 13, 2007) (noting, in options backdating context, that other securities laws regulated the conduct at issue and "Section 16(b) should not be pressed into service whenever insiders behave badly").  Instead, plaintiff rests his position on inapposite arguments about the implied covenant of good faith and fair dealing in contracts, and the good-faith obligations owed by fiduciaries (Pl. Mem. at 18-19), neither of which should be imported into the objective framework of the SEC's Rule 16a-7.

Plaintiff cites no relevant authority for his assertion that Rule 16a-7 requires the Lead Underwriters to make an affirmative demonstration of "honesty and decency."  Moreover, his position, if accepted, would substitute a subjective hindsight analysis into underwriters' state of mind in place of the objective analysis intended for Section 16 by Congress, which ordained a scheme "'capable of easy administration.'"  *Gibbons v. Malone*, 703 F.3d 595, 603 (2d Cir. 2013) (quoting *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972)).  The exemption applies not just to disgorgement, but also to the basic obligation under Section 16 to *report* the transaction.  *See* 15 U.S.C. § 78p(a) (setting forth disclosure obligations of Section 16).  Plaintiff's assertion that an underwriter's determination whether a report is required depends on a self-assessment of compliance with unspecified "standards of honesty and decency" runs counter to the objective criteria that govern the application of Section 16.

Contrary to plaintiff's argument (Pl. Mem. at 1, 22 n.10, 31-32), the Second Circuit's decision in *Perine v. William Norton & Co.*, 509 F.2d 114 (2d Cir. 1974), does not support plaintiff's "honesty and decency" standard.  In *Perine*, the Second Circuit remanded the case to the district court to determine whether the underwriter defendant satisfied the "good faith" requirement for exemption under Rule 16b-2 (the predecessor to Rule 16a-7), in view of allegations by the SEC in a recent administrative proceeding that the defendant had used the underwriting "as a vehicle for manipulating [the issuer's] stock."  *Id.* at 121.  The exemption was put into question, in other words, by allegations that the underwriting activity was undertaken for an improper purpose.  The opposition makes no argument that the Facebook IPO was undertaken as "a vehicle for manipulating" Facebook's stock.

### C.    The Opposition Does Not Overcome Plaintiff's Failure to Plead with Particularity that the Facebook IPO Was Not Conducted in Good Faith.

Apart from its incorrect theory that the Rule 16a-7 exemption turns on the Lead Underwriters' subjective good faith, the opposition identifies no basis to question the Lead Underwriters' good faith in participating in the Facebook IPO, much less any allegations that satisfy the strict standards for pleading fraud under Rule 9(b).  Plaintiff mistakenly argues that Rule 9(b) is inapplicable because a Section 16(b) claim is not a fraud claim.  But, as the Second Circuit has explained, "[b]y its terms, Rule 9(b) applies to 'all averments of fraud'" and "is not limited to allegations . . . expressed in terms of the constituent elements of a fraud cause of action."  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)); *see Reyes*, 2007 WL 518621, at *8 & n.2 (applying Rule 9(b) to Section 16(b) claim because plaintiff's "theory of liability" sounded in fraud); *see also Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) ("[A] complaint may sound in fraud even where, as here, no fraud claims under the Exchange Act are

asserted."); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at

*4-5 (S.D.N.Y. June 28, 2007) (applying Rule 9(b) to standalone claim of manipulation under

Commodity Exchange Act because conduct alleged "sounded in fraud").

    Plaintiff does not dispute that the complaint's "allegations of knowing or deliberate

conduct" by the Lead Underwriters sound in fraud.  (Pl. Mem. at 24.)  Nor could he, given that

his opposition expressly accuses the Lead Underwriters of insider trading.  (*Id.* at 26; *see also*

Letter from Jeffrey S. Abraham to Hon. Robert W. Sweet (Dec. 24, 2013), Dkt. No. 21 ("Pl.

Letter"), at 1.)  Plaintiff argues that Rule 9(b) is inapplicable because his fraud allegations relate

to what he asserts is a potential affirmative defense, rather than to his claim (Pl. Mem. at 24), but

the distinction is spurious and is not recognized by any of the cases cited by plaintiff.  And, in

any event, plaintiff cannot both assert fraud as a means of surviving dismissal and seek to avoid

the higher pleading burden that such assertions entail.  *See Dawson v. Bumble & Bumble*, 246 F.

Supp. 2d 301, 316 (S.D.N.Y. 2003) (plaintiff may not "rewrite" complaint through opposition

brief).[7]

---

    [7] Plaintiff fails to distinguish *Roth* (*see* Pl. Mem. at 24 n.11), in which the court dismissed
a Section 16(b) claim based on the exemption in Rule 16b-3(d) where the complaint "failed to
satisfy the heightened pleading requirements [of Rule 9(b)] applicable to [the plaintiff's] claim"
that the defendants had engaged in fraud.  2007 WL 518621, at *8.  Plaintiff's reliance on
*Dreiling v. America Online, Inc.*, No. C05-1339JLR, 2005 WL 3299828 (W.D. Wash. Dec. 5,
2005) (Pl. Mem. at 26), is unavailing, because in *Dreiling*, the court held that Rule 9(b) did not
apply to allegations as to "the *existence*" of a group.  *Id.* at *2 & n.4.  That holding in no way
suggests that allegations of bad faith that sound in fraud need not satisfy Rule 9(b).  *Lewy v.
Skypeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916 (S.D.N.Y. Sept. 10,
2012), and *M'Baye v. N.J. Sports Production, Inc.*, No. 06 Civ. 3439 (DC), 2007 WL 431881
(S.D.N.Y. Feb. 7, 2007), cited in the opposition (Pl. Mem. at 25), simply confirm that a non-
fraud claim is not subject to Rule 9(b) merely because a complaint also contains a distinct claim
of fraud.  *See Lewy*, 2012 WL 3957916, at *9; *M'Baye*, 2007 WL 431881, at *11.  Here,
plaintiff's only claim is predicated on allegations that sound in fraud.  An entirely different
scenario was presented in *Stern v. General Electric Co.*, 924 F.2d 472 (2d Cir. 1991).  (Pl. Mem.
at 24.)  There, the court declined to consider a single sentence in the complaint that was its "only
reference to fraud."  *Stern*, 924 F.2d at 477.

Whether Rule 9(b) or the less exacting *Twombly* standard applies, the opposition points to no allegations that would support plaintiff's theory that the Lead Underwriters acted in bad faith. Plaintiff argues that the Lead Underwriters disclosed their analysts' revised revenue estimates to institutional investors but not retail investors.  (Pl. Mem. at 20, 22-23.)  But, as this Court recently held, the federal securities laws do not require issuers to disclose internal projections.  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2013 WL 6665399, at *14 (S.D.N.Y. Dec. 12, 2013) ("*Facebook II*"); *see also* Defs. Mem. at 28-30.[8]  Moreover,  plaintiff's own exhibits establish that the Lead Underwriters could communicate their analysts' estimates orally to their clients but were ***prohibited*** from communicating broadly with other potential investors.  (*See* Abraham Decl. Ex. C at 4-5 ("As early as May 9, 2012, Morgan Stanley, JPMorgan, Bank of America and Goldman Sachs cut revenue forecasts, which they were ***only*** permitted to communicate orally to their customers, ***and not broadly to the public***." (emphasis added).)[9]

---

[8] Moreover, any internal projections and estimates of Facebook's second-quarter and full-year revenues were not material, as this Court has already determined.  *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 922 F. Supp. 2d 445, 472 (S.D.N.Y. 2013) ("*Facebook I*") ("Courts throughout the country have uniformly agreed that 'internal calculations and projections are not material facts that are require[d] to be disclosed' in a registration statement." (quoting *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 177-78 (S.D.N.Y. 1996))); *see also Facebook II*, 2013 WL 6665399, at *14.  Plaintiff's argument that *Facebook I* merely addressed the conduct of Facebook's directors (Pl. Mem. at 23) is plainly incorrect, *see* 922 F. Supp. 2d at 468.  Further, plaintiff's suggestion that *Facebook II* "held" that Facebook's revised revenue projections were material (Pl. Letter at 1) is wrong.  *Facebook II* reiterated the Court's prior determination that projections are not material, *Facebook II*, 2013 WL 6665399, at *14, and distinguished the conclusory allegations in the derivative complaint, explaining that the "'essence'" of the derivative action "was that Facebook failed to 'disclose its internal revenue projections,'" *id.* at *26.

[9] Plaintiff contends that the Court may not resolve disputes concerning industry practice on a motion to dismiss.  (Pl. Letter at 1.)  But, plaintiff does not – and, indeed, cannot – dispute that underwriters' analysts are legally permitted to communicate only orally, with certain investors, as his own exhibits demonstrate.  *See In re Facebook, Inc., IPO Sec. & Derivative* (....continued)

The Lead Underwriters' purchases of Facebook shares in the open market to cover over-allotment short sales also do not call into question their good faith.  (Defs. Mem. at 5-8.) Plaintiff does not – and, indeed, cannot – argue that such conduct is improper.  *See* Amendments to Regulation M:  Anti-Manipulation Rules Concerning Securities Offerings, Release No. 33-8511, 69 Fed. Reg. 75774, 75780 (Dec. 17, 2004) (expressly recognizing that over-allotment short positions may be covered by "purchasing shares in the market once secondary trading begins").  He instead contends that the profits earned by the Lead Underwriters through these transactions evidence bad faith on their part.  But, it is fatuous to criticize underwriters for earning fees in an offering; it is their option to cover the over-allotment short position by purchasing from the issuer and selling shareholders or from the secondary market, and it is not bad faith to cover at the lower price.  Indeed, when, as here, they cover in the market, their purchases "generate market demand and help support the price."  David A. Westenberg, *Initial Public Offerings: A Practical Guide to Going Public* § 19:3.4 (1st ed. 2011).[10]

---

*Litig.*, MDL No. 12-2389, 2013 WL 6798160, at *14 n.16 (S.D.N.Y. Dec. 23, 2013) (noting that the Court may consider such materials).

[10] Plaintiff argues based on a study of short-selling in IPOs that the amounts allegedly earned by the Lead Underwriters in covering over-allotments were atypical.  (Pl. Mem. at 21 (citing Amy K. Edwards & Kathleen W. Hanley, *Short Selling in Initial Public Offerings*, 98 J. Fin. Econ. 21, 33 (2010) ("Edwards & Hanley")).)  Contrary to plaintiff's contention, however, that study says nothing about underwriters' earnings from such transactions.  Instead, the study unsurprisingly acknowledges that "the underwriter will cover its shares in the open market when the market trading price is near or less than the offer price in order ***to provide price support***."  Edwards & Hanley, 98 J. Fin. Econ. at 33 (emphasis added).  Further, the opposition's reliance upon FINRA Rule 5131(d)(3)(B)(ii) is misplaced.  (Pl. Mem. at 21.)  That rule governs what underwriting agreements must require if a purchaser in an IPO returns shares to a syndicate member and the stock is trading at a premium to the offering price.  *See* FINRA Rule 5131(d)(3)(B)(ii), *available at* http://finra.complinet.com/en/display/display_main.html?rbid= 2403&element_id=9751.  The rule does not address the covering of over-allotments.

The Court should reject the opposition's invitation to draw an inference of bad faith based on the alleged short-selling by investors following the IPO.  Plaintiff asserts that such short-selling made up 25 percent of the first-day trading volume (Pl. Mem. at 30), but the opposition identifies no allegations regarding who actually engaged in short-selling.  Nor does it point to any facts to support the assertion – which is not alleged in the complaint – that the alleged short sellers had "superior access from corporate insiders to material information."  (Pl. Mem. at 20.)  In any event, plaintiff's own sources fail to indicate that the level of short-selling in the Facebook IPO was atypically high or that the vicissitudes of market supply and demand forces can transform a bona fide distribution into something else.  *See* Edwards & Hanley, 98 J. Fin. Econ. at 24-25 & fig. 1 (demonstrating that first-day short-selling in IPOs approaches 20 percent or greater (as a percentage of shares offered) in nearly 10 percent of IPOs, with a maximum of over 34 percent in one of the IPOs studied).

Plaintiff also asserts that JPMorgan and Goldman Sachs facilitated some unspecified portion of short-selling activity by lending shares to short sellers.  (Pl. Mem. at 30.)  The opposition does not dispute, however, that financial services firms are permitted to lend shares to short sellers or that such lending is common in the aftermarket of IPOs.  (Defs. Mem. at 31.)[11] Moreover, the Lead Underwriters' purported "motive" to facilitate a decline in the post-IPO stock price by lending shares to short sellers – "earning a reported $100 million trading profit" (Pl. Mem. at 26) – is precisely the kind of "generalized profit-seeking motive[] that courts have repeatedly rejected."  *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.).  Such a motive is also implausible in light of the Lead Underwriters' reputational interests

---

[11] Here again, plaintiff's own authority supports the commonplace nature of aftermarket share lending.  (*See* Defs. Mem. at 31; Declaration of James P. Rouhandeh in Support of Lead Underwriters' Motion to Dismiss (Dkt. No. 13), Ex. G.)

and annual revenues.  (*See* Defs. Mem. at 32 (citing cases).)  *In re IPO Securities Litigation*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003), cited by plaintiff (Pl. Mem. at 27), is not to the contrary.  The scheme alleged in *In re IPO* was to *drive up* the aftermarket price – the opposite of what the opposition contends occurred in the Facebook IPO – which *benefitted* the underwriters reputationally.  *See* 241 F. Supp. 2d at 311 (noting SEC bulletin stating that underwriters have an incentive to *inflate* the post-IPO price artificially "because they have underwritten the risk of the offering, and a poor aftermarket performance could result in reputational and subsequent financial loss").[12]

## III.  PLAINTIFF FAILS TO DEMONSTRATE THAT GOLDMAN SACHS EARNED SHORT-SWING PROFITS

In addition to his flawed argument that Goldman Sachs was a member of a group with the Selling Shareholders, plaintiff also persists with his separate theory that Goldman Sachs was itself a greater than 10-percent owner of Facebook's stock.  The opposition now defends that theory based on a Form 4 filed on May 17, 2012, in connection with the sale of stock in the IPO by certain Goldman Sachs entities.  (Pl. Mem. at 16, 34.)  No such allegation appears in the complaint.  In any event, the same Form 4 on which plaintiff relies also indicates that, as a result of that May 17 sale, these Goldman Sachs Group entities were no longer 10-percent owners subject to Section 16.  (*See* Abraham Decl. Ex. D at 1 (checking the exit box to reflect that Goldman Sachs filing entities no longer were subject to Section 16).)

---

[12] The only two cases cited by plaintiff as purportedly finding Rule 9(b) satisfied based on analogous facts dealt with scienter in the context of Section 10(b) claims against issuers and executives, not underwriters.  (*See* Pl. Mem. at 27 (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999); *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 422 (S.D.N.Y. 2011)).)

Apart from its failure to show how Goldman Sachs was subject to Section 16, the opposition also fails to demonstrate that Goldman Sachs obtained short-swing profits subject to disgorgement under Section 16(b).  Indeed, the opposition abandons the complaint's theory of Section 16(b) liability – that Goldman Sachs acquired 9,507,859 shares of Facebook stock in May 2012 after the IPO and subsequently sold 5,591,649 shares between July 1 and September 30, 2012.  (Compl. ¶¶ 43-45.)  In his brief, plaintiff instead acknowledges that Goldman Sachs owned 8,917,622 shares of Facebook stock as of May 17, and he now asserts that Goldman Sachs bought only 536,237 additional shares.  (Pl. Mem. at 34 ("In order for Goldman Sachs to have owned 9,507,859 shares of Facebook stock on June 30, 2012 (Complaint ¶43), it must have acquired 536,237 shares beyond the 8,917,622 shares it reported owning on May 17, 2012.").)[13] Plaintiff identifies no fact in the complaint (or in his brief) that indicates an inference that Goldman Sachs sold its Facebook stock in the IPO at a price higher than the price at which it allegedly later purchased these shares in the market.

Under this new and unpleaded theory, plaintiff fails to state a plausible claim that Goldman Sachs earned short-swing profits.  Plaintiff speculates that *if* Goldman Sachs purchased the 536,000 shares at issue after May 18, 2012, then it ***might*** have earned short-swing profits under Section 16(b).  But, plaintiff concedes that he has no factual basis upon which to make any such allegation.  Indeed, he admits that the "specific details" about any transactions are "***unknowable***" to him.  (Pl. Mem. at 33 (emphasis added).)  To survive a motion to dismiss, plaintiff must allege something more than "a sheer possibility" that Goldman Sachs earned short-swing profits.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  He must allege facts sufficient to

---

[13] It is black letter law that plaintiff may not amend his complaint through his opposition brief.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

"'nudge[]'" his claim "'across the line from conceivable to plausible.'" *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 501 (S.D.N.Y. 2013) (Sweet, J.) (quoting *Twombly*, 550 U.S. at 570). His pure conjecture that Goldman Sachs might have sold shares of Facebook stock at prices higher than it purchased them is not enough to satisfy this requirement. *See JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 526 (S.D.N.Y. 2013); *Chechele v. Morgan Stanley*, 896 F. Supp. 2d 297, 304-05 (S.D.N.Y. 2012) (dismissing Section 16(b) claim because allegations about certain purchases and sales constituted "mere speculation").

## CONCLUSION

The Court should dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiff's request for leave to amend the complaint (Pl. Mem. at 35 n.15) should be denied as futile.

Dated:   New York, New York
        January 24, 2014

                               DAVIS POLK & WARDWELL LLP

                   By:   /s/ James P. Rouhandeh               

                        James P. Rouhandeh
                        Charles S. Duggan
                        Andrew Ditchfield

                        450 Lexington Avenue
                        New York, New York 10017
                        Telephone:   (212) 450-4000
                        Facsimile:   (212) 701-5800

                        *Attorneys for Defendants Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, and Goldman, Sachs & Co.*