E49BLOWM                          Motion

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ROBERT LOWINGER,

4                    Plaintiff,

5           v.                              13 CV 4016 (RWS)

6    MORGAN STANLEY & CO. LLC, et
     als.,
7
                     Defendants.
8
     ------------------------------x
9                                           New York, N.Y.
                                            April 9, 2014
10                                          1:20 p.m.

11   Before:

12                        HON. ROBERT W. SWEET,

13                                          District Judge

14                              APPEARANCES

15   ABRAHAM, FRUCHTER & TWERSKY, LLP
          Attorneys for Plaintiff
16   JEFFREY S. ABRAHAM
     PHILIP T. TAYLOR
17
     DAVIS POLK & WARDWELL L.L.P.
18        Attorneys for Defendants
     JAMES P. ROUHANDEH
19   ANDREW DITCHFIELD
     CHARLES S. DUGGAN
20

21

22

23

24

25

1          (In open court)

2          (Case called)

3          MR. ROUHANDEH:  Thank you, your Honor.  Jim Rouhandeh

4     from Davis Polk & Wardwell for the Morgan Stanley, JPMorgan and

5     Goldman Sachs defendants.

6          This is an action under 16(b) brought by Mr. Lowinger

7     against the three lead underwriters of the Facebook IPO.  It's

8     a very straightforward case.  There's motions are made.  There

9     are three simple questions.

10          The first is:  Did the underwriters and the selling

11     shareholders form a group under 16(b)?

12          And the second is:  Can plaintiff vitiate the

13     exemption under 16(b) for good faith underwritings?

14          And the third is:  Are the allegations relating to

15     Goldman Sachs, do they suggest anything that they earned any

16     profit and therefore should be somehow treated-- whether those

17     allegations are any different than the allegations made against

18     the other underwriters?

19          On the first issue, the plaintiffs failed to plead the

20     existence of a group.  What they do is-- well, first, the

21     relevant statute says that -- and 16(b) borrows here from

22     13(d).  They say a group is formed -- the statute and the rules

23     say a group is formed where there is an "an agreement to act

24     together for the purpose of acquiring holding, voting, or

25     disposing of securities."

1          The plaintiffs here are saying there was such an

2     agreement, and they point to lockup agreements entered into by

3     the selling shareholders.  The underwriters were not parties to

4     those agreements, to those lockup agreements.  They impose no

5     obligations whatsoever on the underwriters.  They were solely

6     obligations on the selling shareholders.

7          And the first point here is that plaintiffs can't cite

8     to a case at all, any case that has ever found that the

9     underwriters are part of a group as a result of a lockup

10    agreement executed by selling shareholders.  The courts that

11    have looked at that issue have always required something more,

12    some additional supporting allegations.  There are none here.

13         The second issue is that the language here, that "an

14    agreement to act together for purpose of acquiring, holding,

15    voting or disposing of securities," is not disjunctive.  Well,

16    it's a disjunctive in the sense that it can be acquiring,

17    holding, voting or disclosing, but it's not otherwise

18    disjunctive.

19         The agreement to act together and the common purpose

20    and the either buying, selling, holding or voting have to all

21    come together.  You can't do what the plaintiffs -- and the CSX

22    case on the Second Circuit has made that clear.  You can't do

23    what the plaintiffs are doing here, which is to say, oh, we

24    have an agreement.  There's a lockup agreement.  Over here

25    there's a purpose to do an IPO transaction.  And over here

1    there were some-- an agreement to hold securities which the

2    selling shareholders did.

3            That-- and that's what they're trying to do here.  The

4    definition of a group is borrowed again, as I said, from 13(d)

5    in the Williams Act, which is -- you know, if you look at the

6    purpose behind that, it was so that people couldn't get

7    together, act together, and just not hit the 5 percent

8    threshold and have an agreement to all vote in favor of a

9    transaction or all sell at a certain time.

10            That's really what it was intended to do.  Applied to

11   this case, that's not at all what was going on here.  All you

12   had is a lockup agreement, again pursuant to what selling

13   shareholders said.  We'll limit the number of shares that we

14   will sell 91, 181 and 211 days after the date of the

15   prospectus.

16            So here, in fact, the plaintiffs have really sort of

17   pled themselves out of court.  Because what they plead is that

18   the selling shareholders agreed to hold their stock, but not

19   the underwriters.  In fact, they allege that the lead

20   underwriters bought shares in the aftermarket to cover the

21   overallotment in connection with the overallotment option.

22            So they're saying on the one hand the selling

23   shareholders are holding; on the other hand the underwriters

24   are free to buy, sell, or do whatever they want with Facebook

25   stock during that same lockup period.

1    In fact, they allege again-- the first set of

2    allegations were paragraph 241 and 42 relating to the

3    underwriters buying shares in the aftermarket to cover

4    overallotment short sales.  They also allege specifically as to

5    Goldman Sachs that Goldman Sachs bought and sold Facebook stock

6    during the lockup period.  That's complaint paragraphs 43

7    through 45.  So those transactions are fundamentally

8    inconsistent with the underwriters agreeing with the selling

9    shareholders to hold Facebook stock.

10   You've got on one hand some members of the group

11   holding securities; on the other hand, you've got other members

12   of the alleged group freely buying and selling subject to no

13   agreement.  That obviously cannot satisfy the statutory

14   definition of a group.  And, in fact, what it would do

15   otherwise is essentially subject every ordinary course

16   underwriting to 16(b).

17   Even apart from that issue and even if there were a

18   satisfactory basis in the complaint or in the law to establish

19   that there is a group here, or to plead that there is a group,

20   the underwriters, the claim against the underwriters still

21   fails because 16(a)(7) creates an exemption for good faith

22   underwritings.  And all that's really required is a bona fide

23   distribution of securities.

24   This is -- what plaintiffs are trying to do is to

25   say -- is to sort of give the Court a disclosure obligation

E49BLOWM                          Motion

1   into 16(b) by saying, well, it's not a good-faith underwriting

2   if we can allege that there was a nondisclosure or a

3   misrepresentation in connection with the offering.

4          Now, obviously what that would do would be to bleed in

5   all of the disclosure obligations of the securities laws into

6   16(b), which is a strict liability statute, which isn't

7   supposed to-- it's not a disclosure statute at all.  And it

8   would render-- within this very narrow and very -- set of rules

9   that are provided pursuant to it and it would just completely

10  expand those by saying, well, the exemption for underwritings

11  doesn't really apply unless-- because we can allege a

12  misrepresentation.  Once we do that, all underwritings are

13  going to come with a 16(b) claim.

14         And it would-- so what the plaintiffs do is they sort

15  of are hunting around for something to suggest that this wasn't

16  a good-faith underwriting.  They allege misrepresentations.

17  They also look to the good-faith dealing under contract law and

18  try to borrow that standard of what good faith means.  It

19  says -- it means honesty and decency and, therefore, we can

20  allege bad faith or not a good-faith underwriting if we can say

21  somehow this wasn't an honest or decent.

22         Again, that really is contrary to the whole intent

23  behind 16(b) to turn it into a disclosure statute.  In effect,

24  it's inconsistent with the exemption to assert that any

25  underwriting in which you could allege that there was a

1    misrepresentation makes it not a bona fide underwriting.

2            Then the third point is very simple.  All the counts

3    fail against all three of the lead underwriters.  But, in

4    addition, the plaintiffs seem to say, well, Goldman Sachs has--

5    we have some allegation that Goldman Sachs individually, we can

6    point to their having earned a profit in the period after the

7    prospectus.

8            But they have submitted-- first of all, there's no

9    different additional argument as to Goldman.  The argument is

10   that Goldman, along with the other lead underwriters, formed a

11   group with selling shareholders.  They try, however, to suggest

12   in their brief that Goldman was a 10 percent shareholder and

13   they attach a Form 4 filed by Goldman Sachs that is Exhibit D

14   to the Abraham declaration which makes clear that Goldman Sachs

15   checks the box saying they're not subject to the rule, they're

16   not a 10 percent shareholder.

17           So on its face that certainly doesn't support the

18   suggestion that Goldman Sachs was ever-- was a 10 percent

19   shareholder or an insider on its own.  And that's really what

20   they're trying to do.  They're trying to say Goldman alone

21   might have potential 16(b) liability, but they've pled

22   themselves out of court on that one.

23           The other fundamental problem that they have is they

24   speculate that Goldman Sachs made a profit.  What they do is

25   they say Goldman Sachs brought nine and a half million shares

E49BLOWM                          Motion

1   in May 2012, after the IPO, and then they say they sold 5.6

2   million shares between July 1 and September 30th, 2012.

3          Now, the problem with that is -- in essence what

4   they're saying is you sold at a higher-- we think you sold at a

5   higher price in the third quarter of 2012 than you bought in

6   May 2012.  But they admit that they have no basis; that the

7   prices that Goldman Sachs sold at are unknowable to them.  They

8   say that in paragraph-- page 33 of their brief.  They're just

9   speculating that Goldman sold at a higher price.

10         Now, maybe you could make that a reasonable inference

11   if all of the trading prices in the period from July 1 to

12   September 30th were higher than any of the trading prices in

13   May of 2012, but that's not the case.  And they plead

14   themselves that there's an overlap.

15         So it's perfectly possible that Goldman Sachs bought

16   at prices that were higher in May 2012 and sold at prices that

17   were lower in the third quarter of 2012.  And it wouldn't be

18   inappropriate to really infer that they made a profit at all

19   with respect to those purchases and sales given that the

20   plaintiffs are saying, well, we don't know.  All we know is

21   there's some trading prices.  There's an overlap, and an

22   overlap in terms of those trading prices.  They might have in

23   effect sold at a higher price; they might have in effect sold

24   later at a lower price.

25         And that is the state of their allegations.  And they,

E49BLOWM                         Motion

1    in fact, admit that they cannot-- that the prices are

2    unknowable to them.  Based on that I would submit they can't go

3    forward with any separate theory or independent theory as to

4    Goldman Sachs.

5            Those are the three points I wanted to hit.  I would

6    like to save a few minutes in rebuttal.

7            THE COURT:  Sure.

8            MR. ROUHANDEH:  Thank you.

9            MR. ABRAHAM:  Thank you, your Honor.  Jeffrey Abraham

10   for plaintiff.  Let me start with the last point counsel

11   raised.

12           I'm looking at the Form 4 of Goldman Sachs and they

13   check the box "10 percent beneficial owner."  So I believe they

14   would concede, or at least it's enough for a pleading standard,

15   to establish they were a 10 percent beneficial owner since they

16   checked that box under Form 4.

17           As to the particularity of the trades, we've alleged

18   enough information to make it plausible that Goldman Sachs

19   earned a short-swing profit.  We rely on Judge Chesler's recent

20   decision in Claiborne, which is cited in our brief, and which

21   defendants ignore in their reply.  And we go through the

22   analysis in our brief of why it's plausible based upon changes

23   in trading price, in Facebook stock, in Goldman Sachs' trading

24   history based upon the Form 13F's that they filed with the SEC.

25           But let me move now to the first argument that my

E49BLOWM                    Motion

opposing counsel made with respect to the issue of group.  Did

they form a group?  Yes.  Does everybody in the group have to

do the exact same thing?  No.  There are cases, it's a case,

*New Valley* case I believe that was decided by Judge Haight,

that says that the members of the group do not have to march in

lockstep.  Here there was a clear objective to the group.  It

was that at least one selling shareholder owning more than 10

percent of Facebook stock would hold that stock.

          Now, my opposing counsel also said the underwriters

were not a party to that agreement.  I disagree.  The

underwriters were parties to the lockup agreement.  The selling

shareholders entered into the lockup agreement with that

selling shareholders.  They were directly parties and they had

common objectives.  They needed the lockup agreement in order

to have an IPO.

          In fact, the lockup agreement at page B3 says the

purpose is to facilitate the sale of Facebook stock in the IPO.

The defendants in their brief, their opening briefs, say it was

necessary to prevent the downward price pressure of additional

stock sales.  And the underwriters go on to say that the

underwriters and the selling shareholders were each separately

interested in ensuring a successful underwriting.  And that's

in defendants' opening brief at page 18.

          Now, while it might be correct that there are no

decisions directly on point holding that an underwriter is a

E49BLOWM                        Motion

member of a group, we're not aware of any contrary decision
either.  And this is not the sort of case that comes up every
day of the week.

        We do point to the SEC amicus brief filed in *Morales
V. Quintel Entertainment*, which says a group can be formed if
one of the purpose is to keep stock off the market.

        And Judge Marrero in *Schaffer v. CC Investments*, which
we cite in our brief and defendants seem to ignore in their
reply brief, says that *Quintel* indicates that a lockup
provision may evince an agreement, but the Second Circuit
declined to express a per say rule requiring such an inference.
But, in other words, it is enough for a pleading motion to have
that lockup agreement.

        And the cases that the defendants cite to the
contrary, quite frankly, are distinguishable.  And for the sake
of the lovely lady, I won't distinguish them here again.  They
are distinguished in our brief.

        And in addition to-- also in the *New Valley* case,
Judge Haight held that even if the group members had widely
divergent interests, so long as they combine together for a
common objective of holding the stock, they were properly
considered members of the single section 13(d) group.

        Now, moving onto the subject of the 16(a)(7) safe
harbor, it's obviously dependent upon the good-faith conduct of
defendants in performing the Facebook underwriting.  There's

E49BLOWM                         Motion

more than nondisclosure here.  The defendants' conduct in

selling Facebook stock while in possession of inside

information, and then buying it back at a lower price, is a

nondisclosure violation in and of itself.  It's an insider

trading violation of its own.

        I want to emphasize that Facebook is not your everyday

IPO.  The size and price of this IPO were increased in the face

of adverse information about the company's operating results,

which the underwriters knew, but was not disclosed at large to

the investing public, but instead was selectively disclosed to

certain investors.  An unusually large proportion of the

offering was sold to retail investors.  An unusually large

proportion of the offering was shorted approximately 25

percent.

        Now, with respect to the underwriter overallotment,

they sold shares short against the overallotment.  And the

purpose of the overallotment is that the underwriters are going

to buy back at the IPO price to prevent the stock from

declining below the IPO price, which we would refer to, I think

is popularly referred to, as stabilization.

        But here they didn't do that.  They sold short of 38

when they didn't disclose key information, material

information.  When the material information came out, they

didn't stabilize at 38.  They took advantage of that

information.  They bought back below 38.  And, according to

1    published reports, beyond the underwriting commission, they

2    earned an additional $100 million on this short-swing

3    trading.

4            This is not an ordinary IPO and the conduct here,

5    certainly on a motion to dismiss, is not good faith.  And it

6    would be defendants' burden to demonstrate, since Rule 16(a)(7)

7    is an affirmative defense, that they have, in fact, acted in

8    good faith.  And they haven't done that.

9            And with respect to the specific shares that they made

10   the real profit on, they did not act as conduit for the selling

11   shareholders or the issuer.  They acted on their own.  They

12   sold shares.  They didn't buy them back on the overallotment

13   option.  They bought them back in the open market at a

14   substantially lower price and they earned an unusually large

15   profit in the IPO, your Honor.

16           Does your Honor have any questions?

17           THE COURT:  Thank you.

18           MR. ROUHANDEH:  Thank you, your Honor.  Just a few

19   quick points.  First as to Goldman Sachs, taking them in the

20   order that Mr. Abraham addressed them.  Goldman Sachs was made

21   a 10 percent shareholder by checking the box.  Your Honor can

22   review it, obviously.  It's Exhibit D to Mr. Abraham's

23   declaration.  There's a box which Goldman Sachs checks and it

24   says "Check this box if no longer subject to Section 16."

25           And, in fact, they couldn't possibly be subject to

1    Section 16 on their own because, as your Honor will see in

2    explanation of response to number 4, it says following the sale

3    as of the date of this filing, which was May 17th, following

4    such sale, GS Group beneficially owns 8.9 million shares of

5    common stock.  We know that there were 421 million shares, not

6    including the overallotment, in connection with the IPO.  It's

7    obviously not anywhere near 10 percent.  They were not a 10

8    percent shareholder.

9         The second issue, the common objectives point, Mr.

10   Abraham said that, in essence, that it was sufficient to have a

11   common objective to really do the IPO and do the things

12   necessary to carry out an IPO.  But the point of the provision

13   and the actual language of the statute says a common

14   objective-- "an agreement to act together for the common

15   purpose of buying, selling, holding or voting."

16        And, in fact, the case that I believe was the *Schaffer*

17   case, that Mr. Abraham read from, he quoted language that

18   referred to a common objective to hold stock.  That's the type

19   of common objective, not simply any common objective in

20   connection with an IPO transaction.  I'm sure he could define

21   many common objectives that were pursued in connection with any

22   IPO, and certainly this one.

23        He also said that-- Mr. Abraham said that the parties

24   don't have to agree to act together, don't have to do the same

25   thing, in essence.  Well, that's not correct.  The language of

E49BLOWM                              Motion

 1   the rule requires acting to get-- agreeing to act together for

 2   the common purpose of holding, and you don't have that here.

 3           Finally, the *Quintel* case that he mentioned,

 4   apparently in response to my argument, that there's no case

 5   holding an underwriter potentially liable under 16(b) as a

 6   result of a lockup agreement, I believe *Quintel* was a group of

 7   shareholders.  It was a group of those three individuals I

 8   believe who privately held a corporation.  And it was combining

 9   their shares and suggesting that they acted as a group.  It is

10   not the case and there still is no case that would support

11   holding underwriters liable on this group theory as part of an

12   IPO.

13           Thank you, your Honor.

14           THE COURT:  Thank you, all.  I'll reserve decision.

15           (Adjourned)

16

17

18

19

20

21

22

23

24

25